# EXHIBIT A



"Seanet Vancouver 2" <seanet@3web.net>
01/26/2006 11:19 AM PST
Please respond to "Seanet Vancouver 2" <seanet@3web.net>

To "ymjeong" <ymjeong@skshipping.com.sg>, <STEVEN@skshipping.com>, "MR.YS CHOI" <yschoi@skshipping.com>
cc "SEANET VANCOUVER2" <seanet@3web.net>
bcc
Subject (CLEAN RECAP) MV TAI CHUNG / SINOCHART

FM : SEANET VANCOUVER

RE : MV TAI CHUNG - SINOCHART

clean recap
=========
HAVE FIXED CLEAN AS FLWG WITH CP DATE
26 JAN 2006

MV TAI CHUNG
-SELF TRIMMING SDBC
-FLAG : PANAMA
-BUILT YEAR : 1982
-CLASSIFICATION: CR
-SUMMER: 37,611 DWMT ON 10.761 M SSW
-TPC 45.50 MT
-LOA: 187.73 M
-BEAM: 28.40 M
-5 HOLDS / 5 HATCHES
-GRAIN CAPACITY : 1,618,467 CFT
-GEAR: 4 X 15 TON CRANES
Speed / Consumption
ABT 14.00K ON ABT 33.00 MT IFO + ABT 2MT MDO
ABT 12.00K ON ABT 25.00 MT IFO + ABT 2MT MDO (ECO)
PORT CONSUMPTION
2.00 MT MOD (IDLE)
3.00 MT MDO (WORKING)
ALL DETAILS ABOUT

ACCT SINOCHART BEJING
DEL DLOSP 1SP KAOHSIUNG ATDNSHINC
LAYCAN 28/JAN-1/FEB
ONE TCT WITH BULK CEMENT VIA UBE TO DUBAI DUR ABT 30-35DS WOG
REDEL PMO ATDNSHINC
HIRE USD12500 DILOT BSS 180CST
ILOHC USD10000 LS

3.75ADD +1.25 TO AUSEA +1.25 PCT TO SEANET VANCOUVER

OTHERWISE ALL OTHER TERMS AND CONDITIONS AS PER PROFORMA CP DTD 11TH
AUG.2004.WITH LOGICAL AMENDMENTS AND FOLLOWING ALTERATIONS:

- MAIN BODY

L.22 REPLACE fpAS PERMISSIBLE" WITH fpCEMENT "

- RIDER CL.

CL.29 DEL ALL DUE TO N/A

CL.32 DEL ALL DUE TO N/A

CL.37 DEL para 1,2,3, AND REPLACE WITH "CEMENT "

CL.40 DEL ALL DUE TO N/A

CL.41 REPLACE "ANY AMOUNT DISBURSED" WITH "MAX USD1000 PER EACH CALLING PORT"

DEL FROM "IN ASSITION ...TO END OF PARA" .

CL.42 PUT "BOTH SIDE OF BS/L COPY?f+ IN BETWEEN "COPY OF THE L.O.I" AND ?fpAND THE ORIGINAL

ON ITEM NO. (A)

CL.45 DEL ALL AND REPLACE,

Charterers have right to let the vessel to lie safely alongside other vessel(s)/ coaster(s)/ lighter(s) at the safe dock or safe

Wharf or safe place (including safe anchorage) for transshipment and/or discharge of cargo and/or for bunkering.. Such

Operations to be carrie out/ under the supervison with prior permission of master with not to be unresaonsaly withheld

Regarding the general safety for the such operations. Master to have the liverty at any time to order the other vessel(s)/

Coaster(s) / lighter(s) away from his vessel or remove his own vessel but the vessel to always remain on hire. Charterers

To provide at their cost appropriate fender for such operation in customary way. To maters?IÑ satisfaction and Charterers to take

Normal customary precaution for such operation

CL.53, CL.54, CL.58 AND CL.59 DEL ALL DUE TO N/A

CL.60 DEL ALL DUE TO N/A (DO NOT USE VSL GEAR AT LOAD/DISCH PORTS0

CL.67 DEL ALL AND REPLACE " CHRS ARE ANLY ALLOWD TO CALL JPN. SPORE.
OMAN AND UAE ONLY"

CL.92 DEL ALL

CL.97 DLE ALL AND REPLACE

ISPS Clause for Time Charter Parties:

a) (I) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or the Company to comply with the requirements of the ISPS Code or this Clause shall be for the Owners account.

(b) (I) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

The Charterers shall provide the Owners with their full style contact

details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers account, unless such costs or expenses result solely from the Owners negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners account.

(d) If either party makes any payment which is for the other party account according to this Clause, the other party shall indemnify the paying party.

- ADDITIONAL CL.

Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

I) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessels failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

ADD CL:

Owners guarantee that vessel¿¬?s hatch covers are to be weathertight all throughout this Charter period and if any hatch cover found defective, same to be rectified at Owners¿¬? time and expenses to master's satisfaction.

Charterers also have the right to carry out a hose test on all hatches on delivery. Time and costs of survey to be for Charterers¿¬? account.

Prices both ends to be U.S.330 per metric ton Intermediate Fuel Oil and U.S.550 per metric ton Marine Diesel Oil.

--END--

THANKS & REGARDS

SEANET VANCOUVER
TEL/FAX : 1-604-444-5112 / -444-5122
EMAIL : SEANET@3WEB.NET

SIMPSON SPENCE & YOUNG
LLOYDS CHAMBERS
1, PORTSOKEN ST
LONDON
E1 8PH
LIMITED

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party,** made and concluded in *LONDON*, *11th* day of *August, 2004*, 19__

Between

Owners of the good *Panamanian Flag* ~~Steamship~~/Motorship *"MERMAID DREAM"* of *(See Clause 44)* ~~of __ tons gross register, and __ tons net register, having engines of __ indicated horse power and with hull, machinery and equipment in a thoroughly efficient state, and classed at __ of about __ cubic feet bale capacity, and about __ tons of 2240 lbs. deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity, allowing a minimum of fifty tons) on a draft of __ feet __ inches on __ Summer freeboard, inclusive of permanent bunkers, which are of the capacity of about __ tons of fuel, and capable of steaming, fully laden, under good weather conditions about __ knots on a consumption of about __ tons of best Welsh coal—best grade fuel oil—best grade Diesel oil, now__~~ and __ Charterers of the City of __

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for about *Period Time Charter between safe ports/berths/anchorages always afloat, always accessible, within Institute Warranty Limits except not always afloat but safely aground – See Clause 6.* *As per Clause 75.* within below mentioned trading limits. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*

Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port, in Owners option, any time day or night Sundays and Holidays included:*

*Skaw / Full Mediterranean Range including Black Sea (excluding Sea of Azov)*
*Gibraltar / Capetown Range – Capetown / Maputo Range*
*Aden / Japan Range including Australia / New Zealand (If Persian Gulf then Passing Muscat Outbound)*
*Vancouver / Valparaiso Range*
*Boston / Bahia Blanca Range including U.S. Gulf / Caribbean*

~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6) as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her *arrival first and subsequent loadport(s) of first voyage* delivery to be ready to receive *any permissible* cargo *to Charterers/Independent surveyors satisfaction. Should the vessel fail to pass such survey then the vessel to be off hire from time of failure until vessel is fully accepted. On delivery and throughout the Charter vessel to be* ~~with clean-swept holds~~ and tight, staunch, strong and in every way fitted for the service, having water ballast, ~~winches~~ *cranes* and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches *cranes* at one and the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, ~~including petroleum or its products, in proper containers,~~ excluding *See Clause 37* ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk, all necessary fittings and other requirements to be for account of Charterers), in such lawful trades,~~ between safe port and/or ports *and/or safe place* ~~in British North America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South America~~ *Trading Exclusions (See also Clause 67)* ~~and/or Europe and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~ *Charterers have the option with ample notice to Owners to breach Institute Warranty Limits against paying additional premium on hull and machinery nett of all rebates according to vouchers from Owners' Hull Underwriters showing additional premium*

as the Charterers or their Agents shall direct, on the following conditions:

1\. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and watchmen other than compulsory;* shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates necessary to comply with current requirements at ports of call* for and during the service.

2\. That, *whilst on hire,* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory* Pilotages, *and also Pilotages in Danish waters in laden condition from Grenaa to Spodsbjerg/Allingen also, if requested by Master due to poor visibility or adverse weather, Pilotage in English Channel,* Agencies, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and ~~shifting boards~~ *any other fittings* already aboard vessel. ~~Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.~~

3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ________ tons and not more than ________ tons and to be re-delivered with not less than ________ tons and not more than ________ tons.~~ *See Clause 35.*

4. That the Charterers shall pay for the use and hire of the said Vessel ~~at the rate of~~ *as per Clause 75* ________ ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on~~ ________ ~~summer freeboard, per Calendar Month~~, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a ~~month~~ *day;* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at *on dropping last outbeard sea pilot or passing safe port Skaw/Full Mediterranean Range including Black Sea (excluding Sea of Azov) / Gibraltar/Capetown Range / Capetown/Maputo Range / Aden/Japan Range including Australia/New Zealand (if Persian Gulf then redelivery to be Passing Muscat Outbound) / Vancouver/Valparaiso Range / Boston/Bahia Blanca Range including U.S. Gulf/Caribbean* unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15/10 days approximate and 7/5/3/2/1 days definite* notice of vessels expected date of re-delivery, and probable port.

5. Payment of said hire to be made *to the Bank account designated by Owners nett of any deductions/transmitting cost from remitting bank* ~~in New York~~ in cash in United States Currency, ~~semi-monthly~~ *15 days* in advance, and for the last ~~half-month~~ *15 days* or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *(See Clause 62).* ~~Time to count from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *or anchorage in port or elsewhere* that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in Argentina, Brazil and Buenaventura only* where it is customary for similar size vessels to safely lie aground.

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers so far as accommodations allow, Charterers paying Owners~~ ________ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or when required by Charterers or their agents to sign on his behalf* Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of *U.S.$15.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *Charterers are to compensate Owners lumpsum U.S.$ 1,200 per month or pro rata in respect of Charterers' entertainment, communication and representation*

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and the consumption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.*

12. That the Captain shall use diligence in caring for *the cargo and for* the ventilation of the cargo.

13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ________

________

~~on giving written notice thereof to the Owners or their Agents~~ ________ ~~days previous to the expiration of the first-named term, or any declared option.~~

14. That if required by Charterers, time not to commence before ________ and should vessel not have *delivered* ~~given written notice of readiness~~ on or before ________ but not later than 4 p.m. Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners to narrow laycan down to a 15 days spread 30 days prior to the first layday. Owners will give the Charterers 15 days approximate and 7/5/3/2/1 days definite notice of the vessel's expected date of delivery and probable port.*

15. That in the event of the loss of time from deficiency *and/or default and/or strike of crew and/or* men or *deficiency of* stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *whatsoever* preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *and all extra expenses may be deducted from the hire*; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London*, ~~New York~~, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. *See further Arbitration Clause 31.*

18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~ York-Antwerp Rules *1974 as amended 1994 or any amendment thereto at London, and as to matters not provided for by these rules, according to the law and usages of London.* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.~~ *Charter hire not to contribute to General Average.*

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

---

---

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* ~~derricks~~) capable of handling lifts up to *their maximum capacity in accordance with the Description Clause* ~~three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric light on deck and in cargo holds as on board sufficient for night work in all holds simultaneously*, ~~lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all *cranes and/or grabs* ~~winches~~ to be at Charterers' disposal during loading and discharging; ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches,~~ shore *cranemen* ~~Winchmen~~ to be paid by Charterers. In the event of a disabled *crane or cranes unless caused by stevedores*, ~~winch or winches,~~ or insufficient power to operate *crane or cranes*, ~~winches,~~ Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time *and extra expenses, including but not limited to standby expenses*, occasioned thereby.

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels, etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to *attached Protective Clause.* ~~the following clauses, both of which are to be included in all bills of lading issued hereunder:~~

~~U.S.A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

~~Both-to-Blame Collision Clause~~

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. *Notwithstanding contents of Clause 25 Owners and Master are bound by contents of approved Ice Clause such as, but not limited to GENCON and NORDICE where incorporated in such Charters hereunder. Vessel never to force nor push ice nor to follow ice breaker.*

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of ~~3-1/4~~ *1.25* per cent is payable by the Vessel and Owners to

on hire earned and paid under this Charter, also upon any continuation or extension of this Charter.

28. An address commission of 2 1/2 per cent payable to *Charterers* on the hire earned and paid under this Charter.

*Clause 29 through Clause 98, Vessel Questionnaire, Baltime 1939 War Risk Clause, New Jason Clause, Both-to-Blame Collision Clause, General Clause Paramount, U.S.A. Clause Paramount, Canadian Clause Paramount and P. and I. Bunkering Clause, are fully incorporated in this Charter Party.*

*OWNERS:* *CHARTERERS:*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

29. Additional Fittings :

Charterers to have the option of welding padeyes and angles, except on fuel tank tops and hoppers, at their own arrangement and expense subject to Master's prior consent and supervision.

Charterers to remove all padeyes and angles at Charterers' time and expense under the Master's supervision before redelivery, unless Owners request Charterers to maintain same without removal, in which case Charterers will be free from removing padeyes and angles.

Charterers have the option to redeliver the vessel without removing padeyes paying Owners US$15.00 per padeye not removed prior redelivery.

30. Arbitration :

This Charter Party shall be governed by English Law. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (L.M.A.A.) terms current at the time when the arbitration proceedings are commenced.

It is hereby agreed that all claims below U.S.$ 50,000 excluding interest and costs, shall be settled as per L.M.A.A. Small Claims Procedure current at the time when the arbitration proceedings are commenced.

31. Arrest :

Should the vessel be arrested during the currency of this Charter at the suit of any person (including the Charterers) having or purporting to have a claim against or any interest in the vessel except if the arrest is caused by cargo claims for which Owners/Master are not responsible, or claims incurred due to irregularity of Bills of Lading issued under Charterers' Letter of Indemnity, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter in respect of any period during which by virtue of the operation of the Clause no hire is payable.

32. Asian Gypsy Moth :

Owners guarantee that upon delivery to Charterers the vessel is free of any infestation by the Asian gypsy moth or its eggs. Should the Owners fail to fulfil their guarantees as above, the Owners shall indemnify the Charterers from any loss or damage sustained by Charterers and all consequences arisen from/in connection with such failure including but not limited to any delay, extra expenses, fines, cost of removal of such moth or its eggs and/or even transhipment of cargo if on board, regardless of whether or not the vessel would be banned from entering into or ordered to leave the Canadian and/or U.S. Waters/ports because of said failure. When Charterers direct the vessel to the area infested by Asian gypsy moth, Charterers shall, at Charterers time and expense, undertake to arrange a certificate issued by an appropriate authority of such area/port certifying that the vessel is free from infestation by Asian gypsy moth or its eggs, and thereby Owners shall not be held responsible for any consequences at the next destined ports.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

33. Bills of Lading :

The Charterers or their agents are authorized to issue and sign Bills of Lading and/or Sea Way Bills on Charterers' form on Owners' and/or Master's behalf, in which case the Charterers to indemnify Owners against all consequences or liabilities arising from their so signing of Bills of Lading and/or Sea Way Bills of Owners' behalf.

34. Bulldozers :

Charterers to have the option to use the bulldozers in vessel's holds, provided not exceeding the tank top strength. If required the vessel to lift onboard the bulldozers by use of vessel's gear.

35. Bunkers :

Bunkers on delivery about 700/800 metric tons Intermediate Fuel Oil and about 50/70 metric tons Marine Diesel Oil.

Bunkers on redelivery to be about the same quantity as bunkers on delivery.

Prices both ends to be U.S.$ per metric ton Intermediate Fuel Oil and U.S.$ per metric ton Marine Diesel Oil.

Specification of Intermediate Fuel Oil / Marine Diesel Oil shall be minimum ISO8217 RMH35 (380 CST at deg. C) / ISO8217 DMC (20 CST at 50 deg. C).

In case of RMG35 not available at bunkering port, Charterers option to supply RMF25.

Value of delivery bunkers to be paid together with the first hire payment.

The Charterers may deduct from the last sufficient hire payment(s) the estimated cost of bunkers on redelivery.

The Charterers are allowed to bunker the vessel for their own account at the port prior to delivery provided it does not interfere with the vessel's operation.

The Owners are allowed to bunker the vessel for their own account at the port prior to redelivery provided it does not interfere with the Charterers' operation.

36. Cargo Claims / P. and I. Club :

Owners guarantee that the vessel is entered and shall remain entered in a Protection & Indemnity Association, which is a member of the Group of International P. and I. Clubs, for the duration of this Charter Party. Entry shall include, but not to be limited to, ordinary cover for cargo claims.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

In the case of damage to and/or loss of cargo carried on the vessel in which Owners and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of such in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims, as between Charterers and Owners, shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996 and its subsequent amendments.

Owners' P. and I. Club : U.K. Mutual

Charterers' P. and I. Club : To be advised

If required by Charterers, Owners to authorise and instruct Owners P. and I. Club to confirm directly to any party as ordered by Charterers that the vessel is fully covered for P. and I. and that collection of premiums are up to date.

37. Cargo Exclusions :

It is understood that the vessel is not employed in the carriage of the following cargoes : fishmeal, caustic soda, direct reduced iron ore in lumps or pellets, livestock, logs, asphalt, copra, motor spirits, motor blocks/turnings, nitrate of ammonia (unless fertilizer grade), arms, ammunition, explosives, injurious, inflammable and dangerous goods, petroleum and its products (see below regarding petcoke), acids, ferro silicon, creosoted goods, sunflower seed expellers, nuclear materials or fuels, radioactive products, waste and acids, wet hides, calcium carbide, naphtha, pitch, tar, asbestos, calcium hypocloride and quebracho, salt, sulphur, cement, scrap of any kind.

Charterers have the option to load concentrates provided they observe all existing laws, rules, regulations and directions of the authorities and classification societies, as well as I.M.O. and relevant national regulations.

Charterers have the option to carry maximum three (3) shipments out of salt, sulphur, cement, petcoke, scrap with maximum one shipment of each dirty cargo

Bulk Cement Loading :

In case of loading bulk cement, the Charterers have the right to modify the vessel's hatch covers and/or holds and/or weather deck so as to be suitable for loading cement in bulk, at the Charterers' time and account. The Charterers are to redeliver the vessel restored to her original condition, to Owners' and Class's satisfaction.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

38. Certificates / Vaccinations :

Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available on board, enabling the vessel to obtain radio free pratique.

If requested, Owners to provide Charterers with copies of any and all such certificates/ approvals.

Any time lost and all extra expenses resulting from Owners' non-compliance with the above to be for Owners' account and may be deducted from hire.

39. Crew Service (See also Clause 79) :

With reference to Clause 8 of this Charter Party "customary assistance" shall include, but not be limited to :

a) All opening and closing of hatches, when and where required
b) Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging
c) Shaping up vessel's holds/hatches and cranes, if fitted, as much as possible prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and crew required under this Charter Party.

40. Deck Cargo :

Charterers may load cargo on deck/hatchcovers subject to the approval of the Master of the vessel without Owners'/Master's liability for loss and/or damage howsoever caused, that cargo is being loaded, lashed and secured in such a manner so as not to affect the vessel's stability or exceed the permissible strength of the deck and the hatchcovers, however, always at the Charterers' risk and expense including supply of loose lashing fittings as required in accordance with the vessel's Cargo Securing Manual approved by her Classification. Bills of Lading covering deck cargo to be marked "carried on deck at Shippers' risk without responsibility for loss or damage howsoever caused".

If the deck cargo is being carried to or from the United States, the following wording should be used : "Carried on deck at Shippers' risk as to perils inherent in such carriage."

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

In all other respects the risk shall be subject to the provisions of the U.S. Carriage of Goods by Sea Act 1936 except that with respect to deck cargo, Owners will not have the burden of proof with respect to any claim arising from or related to allegations of unseaworthiness and that burden will rest with the Shippers and/or cargo interests.

41. Deductions :

The Charterers may deduct from the Charter hire any amount disbursed for Owners' account. In addition, Charterers may deduct from the last hire payment the reasonable estimated expenses incurred by Charterers for Owners' account, notwithstanding that vouchers may not then have reached Charterers for submission to Owners, provided that the difference between estimated expenses and actual expenses shall be adjusted and settled if vouchers available.

42. Delivery of Cargo Agents Letter of Indemnity :

(a) If original Bill(s) of Lading are not available at discharging port, Owners agree to release the entire cargo to the Charterers' order against presentation by Charterers or their Agents of a single letter of indemnity in wording as per Owners' standard P. and I. Club form signed by Charterers only. Discharge to commence on receipt by Owners of a faxed copy of the L.O.I. and the original L.O.I. to be mailed to Owners.

(b) In the event that Charterers instruct the vessel to change discharging port after Bills of Lading or sea waybills have been issued, Owners shall comply with such instructions upon receipt of a faxed copy of a single L.O.I. always giving reasons for deviation, on Owners' standard P. and I. Club wording signed by Charterers only.

43. Delivery / Redelivery Time :

Delivery and redelivery time to be calculated basis Greenwich Mean Time.

44. Description of the Vessel :

**m.v. "MERMAID DREAM"**

Panamanian Flag. Built Oshima Shipbuilding Co. Ltd. Delivery : 19th February, 1998.

47,245 metric tons deadweight on 11.778 metres Summer salt water draft.

LOA : 185.73 metres / Beam : 30.95 metres

Class : NK, NS, MNS

Ore Loading : Strengthened for heavy cargoes in Holds 1, 3 and 5 (2 and 4 empty).

Call Sign 3 F E C 8
Registration No. : 26910-PEXT-1

GT : 25,969 / NT : 16,173

5 Holds / 5 Hatches. Folding Steel Hatch Covers.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

Size of Hatches : No. 1. 17.1 x 15.6 metres
Nos. 2/3/4/5. 19.8 x 15.6 metres

| Holds Capacity : | Grain | | Bale |
|---|---|---|---|
| No. 1 | 395,087 | | 387,366 |
| No..2 | 446,154 | | 437,513 |
| No. 3 | 423,125 | | 414,990 |
| No. 4 | 445,730 | | 437,124 |
| No. 5 | 393,068 | | 385,525 |
| Total | 2,103,164 cubic feet | / | 2,062,518 cubic feet |

4 x 25 metric ton Cranes.

Speed/consumption :
(laden) about 13.5 knots on about 25 metric tons Fuel Oil (380 CST) no Marine Diesel Oil at sea.
(ballast) about 13.5 knots on about 24 metric tons Fuel Oil (380 CST) no Marine Diesel Oil at sea (except when entering/leaving port, manoeuvring and in heavy weather).

In port about 2.1 metric tons Fuel Oil working / 1.5 metric tons idle.

Tanktop Strengths :
1. 20.9 metric tons per square metre
2/4. 16.0 metric tons per square metre
3. 25.8 metric tons per square metre
5. 21.0 metric tons per square metre

WWF ladders / CO2 / ITF / Evaporator fitted.

Crew : Indian Master/Chief Engineer, others Filipino

Hoisting Speed (laden 25 metric tons) : 12 metres / minute

Fuel Oil Capacity : About 1,730.5 cubic metres / Diesel Oil Capacity : About 144.5 cubic metres.

P. and I. Club : U.K. Mutual

All details "about".

Charterers Standard Questionnaire, as attached, shall form part of the Description Clause.

45. Double Banking :

Charterers have the right to load and/or discharge on double banking basis at loading and/or discharge port at a safe dock or wharf or anchorage where it is customary and safe for vessels of similar size and type to be so always subject to Master's reasonable satisfaction. Any additional equipment/facilities such as fenders whenever considered necessary by the Master are to be supplied by the Charterers in their time and at their expense. If at any time during

the operation, the Master reasonably considers it unsafe to continue due to adverse weather conditions etc. he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account. Amount not to exceed the lowest premium calculated on the basis of an advisory rate quoted by the Chairman of Breach of Warranty Committee on the London market.

46. House Flag / Markings :

The Charterers shall have the liberty of flying/marking their own flag at their expense.

47. Boycott :

Owners warrant that the vessel's crew is and will be during the period of this Charter Party employed under a bona fide union agreement, the standard of which is fully acceptable to the I.T.F. and Unions in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotages assistance or any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions, all caused by the vessel and/or by reason of the terms and conditions on which members of the crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any claim that may be presented by third party.

48. In Lieu of Hold Cleaning :

Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum of U.S.$ 4,500 in lieu of such cleaning including dunnage removal/disposal and washing/drying up.

49. Hold On Delivery

Vessel's holds on delivery to be thoroughly clean swept washed down by fresh water and dried up so as to receive charterers intention cargo in all respects, free of salt, loose rust scale and previous residue to the satisfaction of independent surveyor. And if vessel fails to pass any hold inspection/test as above, the vessel shuld be placed off-hire from the time of rejection until the vsl pass the same inspection/ test again, any extra expenses direct related to be for owners account.

50. Insurance :

Premium for annual wars risk insurance on hull and machinery and Officers/crew always to be for Owners' account. Any additional premium nett of all rebates, in respect of these risks solely arising from the vessel proceeding at the Charterers' request to areas designated as

excluded areas by vessel's war risks underwriters to be for the Charterers' account, however, not to exceed what would have been quoted or charged if the vessel was covered on the London market.

If Owners have not covered basic war risk insurance, Charterers only to pay differential as if Owners were covered, and only against presentation of Underwriters' original invoice.

Trading to excluded areas is also subject to the agreement of the crew under the terms of their I.T.F. Collective Bargaining Agreement, and, if this agreement is obtained, to the payment by Charterers of crew war bonus to be agreed with the Master/crew.

51. Intermediate Hold Cleaning :

Vessel's crew shall render customary assistance in cleaning cargo holds in preparation for next cargo if required by Charterers and if not prevented by shore regulations. Such cleaning to be performed provided this can be safely done, weather permitting. Charterers shall pay U.S.$ 400 per hold actually cleaned or U.S.$ 500 per hold actually cleaned in case of water-washing and cleaning including dunnage removal/disposal, if any. In any case Owners are not responsible for passing hold survey for loading of next cargo during the entire period. The work to be done in the same efficient manner as if the vessel was trading for Owners' account but without responsibility and liability on part of Owners regarding acceptance of vessel at loading port if vessel is rejected due to residue of previous cargo(es) carried under this Charter Party.

However, if vessel's holds, hatches or decks are rejected by Charterers' surveyor due to the presence of, inter alia, loose rust, scale or paint then vessel to be placed off-hire from the time vessel fails such a survey until the vessel is fully accepted and the survey passed. Costs of cleaning same to be for Owners' account.

52. Forklift trucks/bulldozers/grabs/magnets etc., shall be allowed to be used in the holds if necessary, provided always within the vessel's permissible load.

53. Loading of Steel :

Steel cargoes to be sufficiently dunnaged/lashed/secured and unlashed/unsecured at Charterers' expense, risk and in their time by stevedores under supervision of the Master and up to his satisfaction.

Charterers agree, if so requested by Owners, to jointly appoint an independent surveyor to perform a preloading survey of the cargo with time and cost equally shared.

Any dunnage already onboard to be at Charterers disposal free of cost to Charterers.

54. Notices :

Owners are to give Charterers 15 days approximate notice of vessel's delivery and are to let Charterers know immediately of any change in vessel's position.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

55. Off-Hire :

Should the vessel put back whilst on voyage by reason of an accident or breakdown, or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person onboard the vessel (other than passengers or supercargo travelling by request of the Charterers) or by reason of refusal of the Master or crew to perform their duties, or oil pollution even if alleged, or capture/seizure, or threatened detention by any authority/legal process, the hire shall be suspended from the time of inefficiency until the vessel is again efficient in the same or equidistant position in Charterers' option, and voyage resumed therefrom. All extra expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

During any off-hire period estimated to exceed 10 days, the Owners to give the Charterers not less than 5 days estimated notice of resumption of the service.

If the vessel has been off-hire for a period of more than 40 consecutive days, the Charterers are at liberty to cancel the balance of this Charter Party, in which case redelivery shall take place upon vessel being free from cargo, irrespective of redelivery ranges.

56. Oil Pollution :

Owners guarantee to provide and maintain, during the entire time charter period, at their expense and carry on board the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where such certificates and/or guarantees are required. All such certificates to be valid throughout the entire time charter period.

The Charterers shall in no case be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any direct consequential losses, damages or expense.

57. On/Off-Hire Survey :

At port of delivery, in Owners' time and at last discharge port prior to redelivery, in Charterers' time, a joint on/off-hire survey to be held by a single independent surveyor jointly appointed. Cost of same to be equally shared between Owners and Charterers. Vessel only to be off-hire for actual working time lost due to surveys.

58. Panama / Suez Canal :

Owners warrant that the vessel is fitted for the transit of the Suez and the Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with all warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant authority, Charterers may suspend hire for all time lost and Owners to pay all expenses arising as a consequence of Owners' failure to comply with this warranty.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

59. Plans :

Owners to courier to the Charterers Capacity Plan, Deadweight Scale, and General Arrangement plan upon delivery or as early as possible prior thereto.

60. Power Clause :

The vessel to supply free of expenses to Charterers 440 volt 3 phase 60 cycles per crane from the power distribution board of the crane within the maximum capacity of 300 ampere provided that cranes of the vessel cannot be used for operation and left idle. Charterers have the right to fit magnets or other loading/discharging equipment customary to the trade onto vessel's subject to vessel's lifting capacity. Charterers to arrange the outlet/socket/suitable cabtire cables and other necessary fittings at the Charterers' time, risk and expense.

61. Protective Clauses :

The New Jason Clause, Both-to-Blame Collision Clause to be read as per standard printing and not be influenced by any mis-typing, the General Paramount Clause, U.S. Clause Paramount, Canadian Clause Paramount, Baltime War Clause, P. and I. Bunkering Clause, as applicable and attached are all to be considered incorporated into this Charter Party and all Bills of Lading issued under this Charter shall include all said clauses.

The U.S.A./Canadian Clause Paramount as applicable, or the Hague Rules as enacted in countries other than the U.S.A. or Canada as applicable to be incorporated in all Bills of Lading.

62. Punctual Payment :

Referring to lines 60 and 61 : Where there is any failure to make "punctual and regular payment", Charterers shall be given by Owners 2 banking days written notice excluding Saturdays, Sundays and holidays to rectify the failure before exercising any right of withdrawal, and where so rectified the payment shall stand as punctual and regular payment.

63. Deleted.

64. Deleted.

65. Stevedore Damage :

Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to :

a) Give written notice to the Charterers or their agent or servant within 48 hours of full particulars of the damage caused and name of the party allegedly responsible for the damage.

b) Promptly but latest within 48 hours of the occurrence give written notice to the party allegedly responsible, giving full particulars of the damage and its alleged cause, and obtain the written acknowledgement of liability from such party or failing that, the acknowledgement of receipt of such notice.

c) Immediately arrange, in conjunction with Charterers' agents, for the damage to be surveyed and an estimate of the repair costs given. Such time spent for damage survey shall be counted on hire and surveyors' fee to be paid by Charterers.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage which must be attended to, as per the above procedure immediately it is discovered but latest prior to redelivery.

66. Taxes :

Taxes and/or dues and/or charges whatsoever, imposed on cargo or vessel by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the hire payable to Owners shall be for Charterers' account.

67. Trading Limits :

World wide trading via safe port(s), always safely afloat at any time within Institute Warranty Limits excluding Cuba, North Korea, Cambodia, Israel, Libya, Lebanon, Albania, Syria Somalia, Liberia, Turkish occupied Cyprus (but the Charterers are allowed to call Chekka for discharge subject to the prior written consent of the Owners/Master, which shall not be unreasonably withheld) and Iraq (but the Charterers are allowed to call Iraq for the discharge of U.N. approved cargoes) and/or countries banned and/or boycotted by the U.N., vessel's H. and M. or P. and I. insurers and war/warlike zones.

Should the global political or social situation change so that trade to countries or places currently listed in the exclusions becomes regular shipping practice, then, subject to the Owners' prior approval which shall not be unreasonably withheld, trade to those countries or places shall be allowed under this Charter Party. However, conversely, should the global political or social situation change so that trade to countries or places currently allowed under this Charter Party becomes unacceptable in normal shipping practice, then the Owners shall, upon giving advance notice to the Charterers and subject to their consent, which shall not be unreasonably withheld, be allowed to include such countries and/or places in the list of excluded trading areas.

The Charterers have the option to break Institute Warranty Limits, provided that the Charterers to reimburse extra insurance incurred thereby nett of all rebates as per vouchers from Owners' underwriters. Charterers have the option to trade NAABSA as per NYPE Clause 6.

68. Crane / Grab

In the event of breakdown of a crane/grab or cranes/grab(s) by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency in relation to the number of cranes or grabs on board the vessel, unless same breakdown, disablement or insufficiency is caused by the act, neglect or omission of Charterers and/or their servants including inter alia and in particular stevedores and/or winchmen/cranesmen.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

Owners are to pay for the cost of hiring shore crane(s)/grab(s) in lieu thereof, if required by charterers. In case of hiring shore cranes vessel to remain on full hire. Owners are to pay for any loss of time and expenses, including but not limited to the cost of labour/stevedores affected by the breakdown.

69. Warranties :

Owners warrant that the vessel :

- is not blacklisted by Arab countries, nor anywhere else within the agreed trading limits.
- has not traded Cambodia, Cuba, Israel and North Korea
- is eligible for bunkers in The United States of America, its territories and possessions, in accordance with directive from The United States Department of Commerce, Office of International Trade.

70. Weathertight Hatches :

The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatchcovers are weathertight. All hatches are to be carefully attended by the crew to prevent leakage.

71. Weather Routing :

The Charterers may supply an independent weather routing company's advice to the Master, during the voyages specified by the Charterers. The Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the vessel's deck logs and weather routing company's reports.

In the event of a dispute over alleged speed and consumption, the weather routing company's report should be taken as a ruling.

72. Deleted.

73. The fixture to be kept strictly private and confidential.

74. Deleted.

75. Hire Details / Periods :

a) Period :

b) Hire : Hire payable 15 days in advance at the rate of U.S.$ daily including overtime.

Charterers to pay first 15 days hire and bunkers on delivery value within 2 (two) banking days after delivery.

Hire payable into Owner's bank account nett of any deductions/ transmitting cost from remitting bank.

The Charter hire shall be remitted to the bank account to be designated by Owners.

76. Deleted.

77. Deleted.

78. I.S.M. :

From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

Any loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the I.S.M. Code shall be for the Owners' account.

79. Deleted.

80. Deleted.

81. Charterers have the option to perform hose/pressure/ultrasonic or similar test at their own expense, in case the vessel fails such survey Owners to rectify the same at their own time and cost and cost and time of the subsequent test(s) to be for Owners' account.

82. Crane Drivers :

Charterers have the option to arrange crane drivers for loading or discharging operations who will stay onboard the vessel which will provide suitable resting/sleeping area. Charterers to pay U.S.$ 15.00 per crane driver per day to Owners covering suitable accommodation onboard and providing suitable meals.

However, the vessel to provide those areas for maximum two persons and Charterers may consult with Owners on a case by case basis if further resting space is required.

83. Deleted.

84. Inspection :

The Charterers or their nominee has the right to inspect the vessel and its records at any given time during the currency of this Charter. Owners/crew are to fully co-operate during such

inspection. Vessel to remain on hire during inspection(s) ordered by Charterers.

85. Layup :

The Charterers shall have the liberty to order the laying-up of the vessel at a safe berth or port for any period of this Charter. In the event of such lay up, Owners shall promptly take steps to effect all possible economies in operation costs if so required by Charterers. The Owners will estimate all such savings including (but not limited to) reductions in insurance and manning costs. If the vessel is laid up the Charter hire shall be reduced by the amount of any savings actually made by the Owners during the laying up period.

Charterers shall bear any expenses related to re-activation of the vessel. Owners shall not be penalized for reduction of speed due to marine growth after laying-up and bottom cleaning, if required, shall be held at Charterers' time and expense.

86. War Cancellation :

In the event of war between/among People's Republic of China, Russia, United States of America, Britain, Japan and/or Denmark, which directly affects the performance of this Charter both the Charterers and the Owners have the option of cancelling this Charter Party. In any event such cancellation shall take place after discharge of cargo at the destination.

87. Vessel's Performance :

If the Charterers have reason to be dissatisfied with the performance of the vessel provided for in the Charter Party, the Owners on receiving particulars of complaint(s) shall immediately investigate and take appropriate steps to correct the situation.

88. Deleted.

89. Deleted.

90. Deleted.

91. Deleted.

92. Sea Waybills :

Whenever Charterers issue Sea Waybills instead of Bills of Lading, such Sea Waybills shall always be deemed to incorporate all the terms and conditions, liberties, clauses and exceptions of this Charter Party including the Law and Arbitration Clause, Paramount Clause, General Average Clause, New Jason Clause and Both-to-Blame Collision Clause.

Owners shall deliver the cargo to a party or parties nominated by Charterers as Consignee written in the Waybill and once cargo has been thus delivered, Owners shall not be responsible for any non-delivery claim from other parties.

93. Drydocking :

No drydocking except in case of emergency.

94. Vessel's Deadweight :

Charterers have the option to re-measure vessel's deadweight for temporary purposes always in conjunction with vessel's class representative and any time/cost incurred to be for Charterers' account.

95. Inmarsat Tracking System :

It is agreed that Charterers may from the time of fixing until expiration of the Charter period employ an inmarsat tracking system on board the vessel. Such tracking system works on data provided from the vessels onboard inmarsat system. It can be activated remotely and no action is necessary on the part of Owners or crew to install or activate the system. The system will automatically provide the vessel's position at set intervals. Such information is available through password controlled internet access. All registration/communication costs relating to this tracking system will be for Charterers account.

Owners to supply the following information which will form part of this clause :

| | | |
|---|---|---|
| Inmarsat B : Maker/Type | : | Anritsu 402 B |
| Telephone | : | Bridge 335202810 |
| Captain Cabin | : | 335202811 |
| Fax | : | 335202812 |
| Telex | : | 335202810 |
| Inmarsat C : Maker/Type | : | Anritsu RSS 405 A<br>No. 435202810 |

96. Charterers' Equipment :

The Master is to keep a record of all Charterers gears, equipment, dunnage and/or stores supplied to the vessel and to maintain same in condition as when supplied as much as possible, time and expense therefore to be for Charterers account. Such gear, equipment, dunnage and/or stores to be returned to Charterers prior to redelivery of the vessel to Owners, or if requested by Charterers at any time during the period of Charter, in condition as supplied (fair wear and tear excepted). Charterers to redeliver the vessel with lashing materials as on board.

97. Bimco ISPS Clause :

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO) / Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision :

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(C) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs of expenses result solely from the Owner's negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(D) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

98. Bimco AMS Clause :

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

(A) If the Vessel loads or carries cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense :

- i) Have in place a SCAC (Standard Carrier Alpha Code);
- ii) Have in place an ICB (International Carrier Bond);
- iii) Provide the Owners with a timely confirmation of i) and ii) above; and
- iv) Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(B) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (A). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(C) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(D) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

## BALTIME 1939 - WAR RISK CLAUSE

A. The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used in any service which will bring her within a zone which is dangerous as the result of any actual or threatened acts of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution civil war, civil Commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

B. Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the Vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand ; and (2) notwithstanding the terms of Clause 11 hire to be paid for all time lost including any lost owing to loss of or injury to the Master, Officers, or Crew or to the action of the Crew in refusing to proceed to such zone or to be exposed to such risks.

C. In the event of the wages of the Master, Officers and/or Crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.

D. The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

E. In the event of the nation under whose flag the Vessel sails becoming involved in war, hostilities, warlike operations, revolution, or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the Vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

F. If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods, shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following Clause shall apply :

## BOTH TO BLAME COLLISION CLAUSE

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

## GENERAL CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels, 25th August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.

## U.S.A. CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April, 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but not further.

## CANADIAN CLAUSE PARAMOUNT

This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights and immunities or an increase of any of its responsibilities or liabilities under the said Act. If any terms of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent but no further.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

**P. AND I. CLUBS OILBUNKERING DEVIATION CLAUSE**

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deeptanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

**Charterers Questionnaire :**

1) Name and Ex Name : "MERMAID DREAM"
2) Built Year / Month : 1998 / February
3) Flag : Panama
4) Type : Bulk Carrier
5) Deadweight and draft in :
   Summer Salt : 47,245 / 11.778 metres
   Winter Salt : 66,003 / 11.533 metres
   Tropical Salt : 48,491 / 12.023 metres
   Fresh : 48,463 / 12.290 metres
6) TPC (Full / Light) : 50.72 / 42.29
7) LOA / Beam / Depth : 185.73 metres / 30.95 metres /
8) Light Ship : 7,073
9) Holdwise Grain / Bale Cubic Capacity :

| Holds Capacity : | Grain | Bale |
|---|---|---|
| No. 1 | 395,087 | 387,366 |
| No. 2 | 446,154 | 437,513 |
| No. 3 | 423,125 | 414,990 |
| No. 4 | 445,730 | 437,124 |
| No. 5 | 393,068 | 385,525 |
| Total | 2,103,164 cubic feet / 2,062,518 cubic feet | |

10) Number of Holds / Hatches : 5 / 5
11) Hold Size (Length x Width x Height) : H1/18.48, H2-5/17.40

   Flat Tank Top Size (Length x Width) :
   H1-L/29.60, B fwd/5.20, B aft/20.80
   H2-L/29.60, B fwd/20.80, B aft/22.00
   H3&H4-L/26.80, B 22.00
   H5-L/29.60, B fwd/22.00, B aft/6.80

12) Hatch Size (Length x Width) :
   No. 1. 17.1 x 15.6 metres
   Nos. 2/3/4/5. 19.8 x 15.6 metres
13) Type of Hatch Cover : Folding Steel Hatch Covers
14) Waterline to top of hatchcoaming :
   Full Ballast : H1/14.888, H2-5/13.888
   Heavy Ballast (including Hold Ballast) : H1/12.449, H2-5/11.449
15) Gear Number / Location / SWL : 4 x 25 metric ton Cranes / 1 Crane at aft of Hold No. 1,2,3 and 4
16) Maximum Outreach of Cranes WZ full SWL : 8.525 metres
17) Grabs : Nil
18) International GRT / NRT : GT : 25,969 / NT : 16,173
   Panama GRT / NRT : 21,597
   Suez GRT / NRT : 27,144.04 / 24,576.18

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

19) Speed / Consumption (Laden / Ballast) :
Speed/consumption :
(laden) about 13.5 knots on about 25 metric tons Fuel Oil (380 CST) no Marine Diesel Oil at sea.
(ballast) about 13.5 knots on about 24 metric tons Fuel Oil (380 CST) no Marine Diesel Oil at sea (except when entering/leaving port, manoeuvring and in heavy weather).

20) In Port Consumption (Idle / 8 hour / 24 hour working) :
In port about 2.1 metric tons Fuel Oil working / 1.5 metric tons idle.
21) Bunker Tank Capacity :
Fuel Oil Capacity : About 1,730.5 cubic metres / Diesel Oil Capacity : About 144.5 cubic metres.
22) Fresh Water Production (daily) :15.0 metric tons
23) Tank Capacity : 302 metric tons
24) Type Main Engine and BHP : Mitsubishi 6UEC50LS 11 - 9570
25) ITF : Yes
26) CO2 Fitted : Yes
27) Aussie Hold Ladders : Yes
28) Head Owners / Disponent Owners Full Styles :
Mermaid Dream Shipholding S.A., 53rd Str., Urbaniziacion Obbario, Tore Swiss Bank 16th Fl., Panama
Disponent Owner : Dampsselskabet Norden A/S , 49 Amaliegade , DK-1256 Copenhagen K.
29) Strengthened for Heavy Cargoes :
Ore Loading : Strengthened for heavy cargoes in Holds 1, 3 and 5 (2 and 4 empty).
30) Permissible Load (MT/M2) on Tanktop :
1. 20.9 metric tons per square metre
2/4. 16.0 metric tons per square metre
3. 25.8 metric tons per square metre
5. 21.0 metric tons per square metre
Upper Deck / Hatch Covers : H1/196.65, H2-5/281.16
Floor Space (M2) Hold by Hold : Ha. 1/266.76, Ha. 2-5/308.88
31) Pedestal Height of Deck Crane from Weatherdeck : 8.40 metres
32) Nationality of Officers / Crew :
Indian Master/Chief Engineer, Others Filipino
33) Masters Name : Capt. Ravinder M. Puri
34) H. and M. Value : Yen 2,037,000,000
35) Underwriters : Tokyo Marine and Fire Insurance Co.
36) Owners P. and I. Club : U.K. Mutual
37) Built Yard : Oshima Shipbuilding Co. Ltd.
38) Home Port : Panama
39) Call Sign : 3 F E C 8
40) Telex : 435202810
41) Inmarsat Telephone / Fax : 3 3520 2810/3 3520 2812
42) Class : NK, NS, MNS
43) Last five cargoes : Steel Slabs / Cement / Gypsum / Wheat / Salt

**RIDER CLAUSES TO M.V. "MERMAID DREAM"**

**CHARTER PARTY DATED 11TH AUGUST, 2004.**

44) Maximum Constants excluding Fresh Water and Stores : 200

45) Deadweight on various drafts (Per every 50 cm)
11.00 M/43315 // 10.50 M/40811 // 10.00 M/38325 // 9.50 M/35859 // 9.00 M/33412 //
8.50M/30984 // 8.00M/28574 // 7.50M/26183 // 7.00M/23807 // 6.50 M/21444 //
6.00 M/19095